GROWTH PROPERTIES, INC., a Delaware Corporation, and Allan L. Berman, General Partner trading as Berman Enterprises, a Maryland Limited Partnership,

v.

The KLINGBEIL HOLDING COMPANY, an Ohio Corporation, and the Klingbeil Company, an Ohio Corporation.

Civ. No. T–75–85.

United States District Court, D. Maryland.

March 19, 1976.

John B. Jaske, Baltimore, Md. (William A. Agee and Sherbow, Shea & Doyle, Baltimore, Md., on the brief), for plaintiffs.

Donn K. Jenkins, Silver Spring, Md., for defendants.

THOMSEN, Senior District Judge.

This case presents the question of the amount of damages to which plaintiffs are entitled by reason of breaches by one or both defendants of obligations under a real estate sale and option contract.

The case is unusual in that defendants permitted a judgment by default to be entered against them, but are contesting the amount of damages which should be included in the final judgment herein.

### Historical Facts

*Finding 1.* At the beginning of the year 1972 plaintiffs were the owners of a tract of land in Baltimore County, north of the Beltway and west of Reisterstown Road and Gwynn's Falls, which flows southerly through Baltimore City to the Patapsco River. The tract contained nearly 115 acres in all, and was divided into four parcels: Parcel A, 33 acres; Parcel B, 27 acres; Parcel C, 27 acres; and Parcel D, 27.6419 acres. The entire tract was then and is still zoned DR–16, which permits up to sixteen dwelling units per acre. Defendants, who are experienced land developers, became interested in purchasing the tract, intending

to build thereon garden apartments, town-houses, and condominiums.

*Finding 2.* On June 23, 1972, the parties entered into the Agreement upon which this suit is based. Although the Agreement names only Growth Properties, Inc., as the "Seller", and The Klingbeil Holding Company as the "Purchaser", the other plaintiff, Berman Enterprises, a limited partnership, which owned a one-third interest in the property, joined in the Agreement to evidence its consent thereto. Growth Properties and Berman Enterprises will be referred to collectively as "plaintiffs" or "Sellers". The Klingbeil Company (the parent corporation of The Klingbeil Holding Company) signed the Agreement "to indicate its consent to be responsible for Purchaser's obligations in those instances in which such responsibility is imposed by the Agreement upon the Klingbeil Company". The term "defendants" will be used when reference to both corporations is intended; when reference only to the Klingbeil Holding Company is intended, the term "Purchaser" or "Holding Company" will be used.

*Finding 3.* The Agreement contained the following provisions material to the issues under consideration in this opinion—

(¶ 1) Plaintiffs agreed to sell and the Holding Company agreed to buy Parcel A (33 acres) for $561,000 ($17,000 per acre), settlement to be held on or before June 30, 1972.

(¶ 8) Plaintiffs granted options to the Holding Company to purchase Parcels B, C and D at $17,000 per acre upon various terms and conditions, of which the following are material in this case.

(a) The option to purchase the first of said parcels (to be selected by the Holding Company) exercisable after January 1, 1973, and prior to the expiration of two years after the date of settlement on Parcel A. (Since the date for settlement on Parcel A was June 30, 1972, see Finding 5, below, the latest date for settlement on the first option parcel became June 30, 1974).

(b) The option to purchase a second parcel, exercisable four years after the date of settlement on Parcel A (i. e., exercisable on or before June 30, 1976).

(c) The option to purchase the final parcel, exercisable six years after the date of settlement on Parcel A (i. e., exercisable on or before June 30, 1978).

(d) Purchaser's option to purchase any option parcel to be exercisable only if it has completed the purchase of Parcel A; its option to purchase a second option parcel to be exercisable only if it has exercised its option to purchase the first option parcel, and its option to purchase the last option parcel to be exercisable only if it has exercised its options to purchase the first two option parcels.

(e) Purchaser to have the right to purchase Parcels B, C and D in any order it wishes, subject to certain conditions not material in this case.

(f) Purchaser to be deemed to have exercised each of the options unless at least 90 days before the expiration of such option plaintiffs were given written notice by registered mail that the option would not be exercised. In the event of Purchaser's failure to give such notice or to notify plaintiffs that it elected to purchase a particular parcel, the option to purchase Parcel D would be deemed the first option exercised, the option to purchase Parcel C the second, and Parcel B the third.

(g) The purchase price for each option parcel to be $17,000 per acre.

(h) Purchaser to pay to plaintiffs, commencing with the date of settlement on Parcel A (June 30, 1972), "interest" on the option price for each of Parcels B, C, and D at the rate of 8% per annum, payable "in arrears", semi-annually, each June 30 and December 31 after the settlement on Parcel A, whether or not Purchaser ever exercises any of the options given it in ¶ 8(a), (b) and (c); Purchaser to continue to pay interest on the purchase price for each parcel as to which it was granted an option until the occurrence of one of the following events with respect to such parcel or parcels: (1) settlement on such parcel or parcels pursu-

ant to exercise of the option with respect thereto, or (2) "receipt by Seller at least ninety (90) days prior to the expiration of such option that Purchaser does not wish to exercise its option with respect to such parcel or parcels, as provided in ¶ 8(e) hereof."

(j) Upon the exercise of Purchaser's option to purchase any parcel or parcels, the Klingbeil Company (the parent corporation) to become responsible for all of Purchaser's obligations under the contract with respect to such parcel or parcels.

(k) Prior to, or at the time of, settlement with respect to each option parcel (except the last), Purchaser to submit to plaintiffs completed development plans for such parcel, approved by the appropriate officials of Baltimore County, providing for the construction of no more than 16 "density units" per acre contained in such parcel, and to agree, for itself, its successors and assigns not to construct more than 16 density units per acre on such parcel at any time without plaintiffs' written consent.

(¶ 9) Settlement on any parcel or parcels as to which Purchaser exercises its option shall be held within ninety (90) days after Seller receives notice of the exercise of such option or within ninety (90) days after such option is deemed to have been exercised as hereinabove provided.

*Finding 4.* An addendum to the Agreement provided that the Holding Company "shall be responsible for the payment of all real property taxes on the real property referred to in this Agreement, whether or not Seller has conveyed such property to Purchaser except that with respect to Parcels B, C or D, said obligation with respect to each such parcel, shall terminate at such time as Purchaser's option to purchase such parcel or parcels has terminated without having been exercised as herein provided." The parties have stipulated that the Holding Company owes plaintiffs $13,166.96 under this provision for taxes.

*Finding 5.* Parcel A was conveyed by plaintiffs to the Holding Company on June 30, 1972. This had the effect of making June 30, 1974, the latest date for the Holding Company to acquire the first option parcel, and March 31, 1974, the latest date for the Holding Company to notify plaintiffs (a) which parcel the Holding Company wished to acquire under the first option, or (b) that the Holding Company did not wish to exercise that option with respect to any parcel.

*Finding 6.* The Holding Company let the March 31, 1974, deadline pass without notifying plaintiffs either (a) which parcel it wished to acquire under that option, or (b) that it did not wish to exercise its option with respect to any option parcel. Therefore, pursuant to ¶ 8(f) of the Agreement, the option to purchase Parcel D on June 30, 1974, was deemed to have been exercised, and pursuant to ¶ 8(j) of the Agreement, the Klingbeil Company became responsible for all of Purchaser's obligations thereunder with respect to Parcel D.

*Finding 7.* On May 14, 1974, the Secretary of Health and Mental Hygiene of the State of Maryland promulgated an order prohibiting Baltimore County and Baltimore City from issuing or granting "any connections contributary to the Gwynns Falls Sewer System above the Baltimore Street overflow chamber * * * " (with certain exceptions not material in this case), until treatment facilities are completed by the City and County to achieve a capacity for treatment of sewage specified in the September 1972 agreement between the United States Environmental Protection Agency, the State of Maryland and Baltimore City. The order stated that its provisions "may be reviewed from time to time as the pollution of the waters of the Gwynns Falls Drainage Basin is corrected".[1]

1. On February 10, 1975, the Secretary, by the Director of the Environmental Health Administration, issued another order which provided (again with exceptions not material in this case) that the "Environmental Health Administration will not approve any subdivision plats, and Baltimore City and Baltimore County shall not approve any connections within the Gwynns Falls Drainage Basin until Baltimore City and Baltimore County demonstrate evi-

*Finding 8.* By a series of agreements, the settlement date on Parcel D was postponed until September 30, 1974, in consideration of (a) the payment of $10,000 by the Holding Company to plaintiffs and (b) an increase in the "interest" payable under ¶ 8(h) of the Agreement for keeping that option open, from 8% per year to 11½% per year.

*Finding 9.* No settlement on Parcel D has occurred. Neither defendant has made any payment to plaintiff with respect to Parcel D since the "interest" payment made on or about June 30, 1974.

*Finding 10.* Neither defendant has ever paid the "interest" under ¶ 8(h) of the Agreement claimed by plaintiffs to have become due on December 31, 1974, and each half year thereafter.

### The Proceedings Herein

Plaintiffs filed this action on January 22, 1975. Their complaint prayed:

(1) Special performance of the Agreement with respect to Parcel D. (This prayer has not been pressed by plaintiffs.)

(2) If specific performance is not granted, damages in the sum of $600,000 for defendants' breach of their obligation to purchase Parcel D on September 30, 1974. (See Findings 3, 5, 6 and 8, above.)

(3) An additional sum of $100,000 for—

(a) damages sustained by plaintiffs as a result of defendants' failure to pay the instalment of "interest" due on December 31, 1974, as provided in ¶ 8(h) of the Agreement, and

(b) defendants' failure to pay the real property taxes on Parcels B, C and D, as provided in the addendum to the Agreement.[2]

(4) Other and further relief.

Defendants were served with process on January 28, 1975, and were served on·July 1, 1975, with an order to show cause why judgment by default should not be entered against them; they filed no pleading or other response, and on July 21, 1975, this court entered a judgment "on the issue of liability" against each defendant.

A hearing on damages was set for October 17, 1975. Defendants had been keeping in touch with the progress of the case, and on October 17, 1975, a member of the bar of this court appeared at the hearing, and requested that it be postponed so that defendants could engage local counsel to appear and contest the amount of damages. Plaintiffs had their real estate appraiser present, prepared to testify. By agreement, the court took the direct testimony and report of the appraiser, but postponed the remainder of the hearing, on condition that defendants pay the expenses of an additional court appearance by the appraiser and plaintiffs' attorney.

On November 19, 1975, a hearing was held at which each side was represented by an attorney and offered evidence. Thereafter, a supplemental deposition of plaintiffs' appraiser was taken, briefs were filed by both sides and oral argument was heard. The principal questions are: the proper construction of the Agreement with respect to the points in dispute; the effect of the judgment by default; the value of Parcel D at the time of the breach of the Agreement by defendants—September 30, 1974; and whether plaintiffs can recover herein for the "interest" provided for by ¶ 8(h) of the Agreement which accrued after September 30, 1974.

dence satisfactory to the Environmental Health Administration that adequate capacity is available within the conveyance system, or portions thereof, without causing overflows of raw sewage from the system during wet weather periods."

**2.** See Finding 4, above. The complaint alleges the failure to pay the taxes due on July 1, 1974.

After the action was filed and before judgment by default was entered, an additional year's taxes became due on July 1, 1975. The question whether the Klingbeil Company (as well as the Holding Company) is liable for these payments will be discussed in Part V of this opinion, below.

*Discussion and Conclusions*

## I

■ Based on ¶ 8(k) of the Agreement, defendants argue that the presentation of plans approved by appropriate officials of Baltimore County was a condition precedent to their duty to go to settlement on Parcel D; that, since no plans would have been approved by the County on September 30, 1974, it was and still is impossible to comply with that requirement; that, accordingly, the settlement date has not yet arrived and no damages have accrued arising out of the defendants' failure to settle. In effect, defendants are arguing that there has been no breach. Defendants have cited no authority in support of their argument.

Plaintiffs reply: (1) that defendants' argument, if valid, would have been a defense on the merits, and is now foreclosed by the default judgment on the issue of liability; (2) that the requirement was for the benefit of plaintiffs, and if timely asserted, would have been waived by them; and (3) that the plans in question could have been submitted before the moratorium took effect.

Conclusion A. The provision relied on by defendants was a promise and not a condition. Restatement, Contracts, §§ 260, 261, 262; Restatement (Second), Contracts, T.D. No. 7, § 253 (1972). Moreover defendants are barred from relying on the claimed defense because of the default judgment. For either or both reasons this claimed defense is of no avail to defendants.

## II

■ The measure of damages for the breach of the Holding Company's obligation to purchase Parcel D on September 30, 1974 (see ¶ 8 of the Agreement in Finding 3, above), is the difference between the contract price—$17,000 an acre, a total of $469,912.30—and the fair market value of Parcel D on the date of the breach, September 30, 1974, in light of the moratorium and other relevant facts. 5 Corbin on Contracts

(1964), § 1098A. The Klingbeil Company is also liable for this item under ¶ 8(j).

■ To determine what a reasonably informed prospective purchaser of Parcel D in September 1974 would have been willing to pay for that property despite the sewer moratorium, several factors must be considered: (i) the fair market value of the property aside from the moratorium; (ii) what a prospective purchaser of Parcel D in September 1974 would have assumed to be the probable length of the moratorium; (iii) the probable increase or decrease in value of similar real estate in comparable sections of Baltimore County during the moratorium; and (iv) the cost of holding the property without substantial return until the end of the moratorium.

(i) Plaintiffs argue that if there had been no moratorium Parcel D would have been worth only $15,000 an acre on September 30, 1974; defendants argue that Parcel D would have been worth $17,000 per acre, which was the contract price per acre for all four parcels, Parcel A in 1972, and the other three, all together not later than 1974 or in the order defendants had the right to choose, not later than in 1974, 1976 and 1978, respectively.

Other factors should be and have been considered. Parcel D was farther from the principal existing road (Dolfield Road) than Parcel A or Parcel B, but a little closer than Parcel C, and would have benefited comparatively more than B or C from the previous development of A. Parcel D was designated by the parties before the moratorium as the first option parcel defendants would be required to purchase, unless defendants gave due notice that they elected (a) to purchase Parcel B or C in 1974, or (b) that they did not wish any of the parcels; whether another purchaser would have preferred D to B or C is not clear. Plaintiffs were compensated for holding the land by the agreed "interest" payments to keep the options open. Plaintiffs' evidence of comparable sales was not persuasive, and certainly not conclusive.[3]

---

**3.** The court has considered the testimony of plaintiffs' appraiser that the property may be

rezoned. That is almost always a possibility with vacant land; it is possible that some part

*Finding 11.* Apart from the moratorium, Parcel D would have been worth $16,000 per acre on September 30, 1974.

(ii) The estimates of the witnesses as to what a prospective purchaser of Parcel D in September 1974 would have assumed to be the probable length of the moratorium vary from four years to at least seven and a half years. The most credible evidence, based upon what was known at the time of the hearing in November 1975, is that the moratorium will probably end in the latter part of 1978 or early 1979; i. e., a total length of four to four and a half years from September 30, 1974. A prospective purchaser in September 1974 would have had less information.

*Finding 12.* A reasonably informed prospective purchaser of Parcel D in September 1974 would have believed that the moratorium would probably last for about five years, and that before September 1979 it would be possible to plan with reasonable confidence the orderly development of the property.

(iii) Both sides presented evidence that Parcel D would increase in value during the period of the sewer moratorium. Plaintiffs' appraiser testified that, in his opinion, appreciation would be 2% per year. This low figure was based principally on his belief that garden apartment development is the highest and best use of the property, and that such development would not be economically feasible for several years because operating costs are increasing at a rate in excess of the projected increase in income. Defendants' witness testified that, in his experience, vacant land has appreciated since the late 1960s at a rate of 10%–15%

per year, and that a similar rate over the next five years or so was to be expected.

*Finding 13.* A reasonably informed prospective purchaser on September 30, 1974, would have expected an appreciation in the value of Parcel D of 25% over the five year length of the moratorium (5% per annum not compounded).

(iv) and *Finding 14.* The cost of holding the property over the five year period of the moratorium, including interest, taxes and other foreseeable charges has been assumed by the parties and is found by the court to be 9½% per year.

Conclusion B. Based upon the facts found in Findings 11 to 14, inclusive,

(a) Parcel D will be worth $20,000 per acre on September 30, 1979;

(b) Discounting the $20,000 per acre figure at 9½% per annum for five years (see Finding 14), the fair value per acre of Parcel D on September 30, 1974, was $12,704;

(c) Subtracting such fair market value per acre from the contract price of $17,000 per acre, shows plaintiffs' damages to be $4,296 per acre, plus appropriate interest.

(d) Multiplying $4,296 per acre by 27.-6419, the acreage of Parcel D, shows the damages for the breach of the Agreement to purchase Parcel D to be $118,749.60, plus interest, which the court finds should be allowed at 6% per annum, from September 30, 1974, to the date of final judgment herein.[4]

█ (e) Because of ¶ 8(j) of the Agreement, the Klingbeil Company, as well as the Holding Company, is liable for the damages resulting from the failure of the Holding Company to consummate the purchase of Parcel D.

of Parcel D might become more valuable as a result of rezoning. The court finds that possible rezoning has no substantial effect on the amount of damages which should be awarded in this case.

4. Defendants' contention that plaintiffs received the equivalent of such interest by the calculation in paragraph (b) of Conclusion B misconceives the purpose of the calculation in paragraph (b). The purpose of that calculation

was to discount the future value of Parcel D to arrive at its value on the date of the breach. The allowance of interest at the rate of 6% per annum is to compensate plaintiffs for the delay in receiving the damages to which they were entitled. See *Robert C. Herd & Co. v. Krawill Mach. Corp.*, 256 F.2d 946, 952–54 (4 Cir. 1958), aff'd 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959).

### III

Plaintiffs claim in their complaint "damages sustained by Plaintiffs as a result of Defendants' failure to pay the installment of interest due on December 31, 1974, as provided in Paragraph 8(h) of the Agreement". This claim for "interest" under ¶ 8(h) of the Agreement is different from the interest allowed in Conclusion B(d), above. The "interest" under ¶ 8(h) is really consideration to be paid by the Holding Company, guaranteed by the Klingbeil Company, for keeping the options open. At the hearing on damages it was conceded that no such payment had been made. Plaintiffs claimed no special damages, and based their claim only on the failure of defendants to pay the money. Neither side discussed the impact of ¶ 8(d) of the Agreement, and when its importance became evident during the preparation of this opinion, the court called for supplemental memoranda with respect to its effect on defendants' obligation to pay any such "interest" which became due after September 30, 1974. Those memoranda have been read and considered.

Paragraph 8(d) of the Agreement provides:

"Purchaser's option to purchase any parcel shall be exercisable only if Purchaser has completed the purchase of Parcel A as herein provided. Purchaser's option to purchase the second option parcel shall be exercisable only if Purchaser has exercised its option to purchase the first of said parcels, and Purchaser's option to purchase the last option parcel shall be exercisable only if Purchaser has exercised its options to purchase the first two option parcels."

Paragraph 8(e) gives the Holding Company the right to exercise its option to purchase Parcels B, C and D in any order it wishes, subject to qualifications not important in this case.

Paragraph 8(f) provides that Purchaser (the Holding Company) "shall be deemed to have exercised each of the options hereby granted unless Purchaser shall give Seller written notice by Registered Mail, at least ninety (90) days prior to the expiration of the option in question, that Purchaser does not wish to exercise such option. In the event of Purchaser's failure to give such written notice, the option to purchase Parcel D shall be deemed to be the first option exercised, the option to purchase Parcel C shall be deemed to be the second option exercised, and the option to purchase Parcel B shall be deemed to be the last option exercised".

The Holding Company did not send plaintiffs any such notification at any time before June 30, 1974. Therefore, it was deemed to have exercised its option to purchase Parcel D. See Finding 6, above.

Conclusion C. The word "exercised" in ¶ 8(d) should be construed in the light of ¶ 8(f); accordingly, the exercise by the Holding Company of the option to purchase Parcel D in one of the manners provided by ¶ 8(f) kept alive the Holding Company's option to purchase Parcels B and C.[5] Defendants have not sought to terminate those options.[6]

Conclusion D. The payments, denominated "interest" in ¶ 8(h), which are really payments to keep the options open, have continued to become due and payable by the Holding Company with respect to Parcels B and C semi-annually up to the present. No such payments have been made since June 30, 1974. The obligation to make those payments with respect to Parcel D terminated on September 30, 1974.

Conclusion E. The Holding Company is liable for the full amount of the payments

---

5. Defendants' witness Stavroff, who was a Vice President of the Holding Company in 1974, testified that just prior to the deadline for deciding whether or not to exercise the option to purchase Parcel D, he re-evaluated the purchase of the parcels and determined that defendants should go ahead with the deal.

6. Unless the Holding Company, on or before March 31, 1976, gives an appropriate notice under ¶ 8(f), it will be deemed to have exercised its option to purchase Parcel C.

under ¶ 8(h) which have become due and payable since June 30, 1974. Whether plaintiffs may recover in this suit the payments which fell due after the complaint herein was filed will be considered in Part IV of this opinion, below.

■ Conclusion F. The Klingbeil Company is liable in this case under ¶ 8(h) of the Agreement only for that portion of the "interest" which is attributable to Parcel D during the period between June 30, 1974, when the last such payment under ¶ 8(h) was made, and September 30, 1974, the date of the breach with respect to Parcel D. That amount is $13,618.06,[7] with interest thereon at 6% per annum to the date on which final judgment is entered herein.

## IV

■ Plaintiffs seek to recover in this action the "interest" payments under ¶ 8(h) of the Agreement until the date of the final judgment to be entered herein. This contention raises two related questions: (i) whether or not the complaint should be read to include a demand for damages for failure to make the "interest" payments under ¶ 8(h) which have become due since December 31, 1974;[8] and (ii) if it should not be read to include such a demand, whether the entry of judgment by default on July 21, 1975, prevents plaintiffs from amending their complaint to make such a demand.

(i) Prayer 3 of the original complaint did *not* make a demand for the "interest" payments under ¶ 8(h) which have become due since December 31, 1974. Whether such a demand should be held to have been made by the general language of prayer 2 and prayer 4 raises a question which has been answered in other cases by invoking various principles, including: on the one hand, that ambiguities in a pleading, as in other documents, should be construed against the draftsman, and that a defendant, in deciding whether to answer a complaint or permit a default, is entitled to notice of the nature and extent of the claims against him; and on the other hand, that Rule 15(b), F.R.Civ.P., permits amendments to conform to the evidence.

Conclusion G. In this case, the narrow claim in prayer 3 argues against its being broadened by the general language of prayers 2 and 4; and since plaintiffs can easily bring another action to recover the "interest" payments under ¶ 8(h) of the Agreement which became due in 1975 after this action was filed, this court concludes that "substantial justice" (see Rule 8(f), F.R. Civ.P.) can best be done by construing prayer 3 to be the only demand in the complaint for "interest" payments under ¶ 8(h).

■ (ii) After the hearing on damages, plaintiffs asked leave, under Rule 15(b), F.R.Civ.P., to amend their complaint to claim "all damages sustained by Plaintiffs as a result of Defendants' failure to pay interest as provided in paragraph 8(h) of the Agreement up to the date of Judgment, and Defendants' failure to pay the real property taxes on parcels B, C and D as provided in the Addendum to the Agreement". This motion, which is opposed by defendants, must be considered in relation to Rule 54(c), which provides, in pertinent part: "A judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment".

The decision of this question is not free from difficulty. No binding authority has been cited or found. The few cases in other circuits reached differing results based upon differing facts;[9] several of them

---

7. That figure is the product of the number of acres (27.6419), the price per acre ($17,000), the annual interest rate (11½%) reduced to a daily rate (.000315) and the number of days between June 30 and September 30 (92).

8. The relevant paragraphs of the prayers are summarized under the heading "The Proceedings Herein", supra.

9. See *TWA v. Hughes,* 32 F.R.D. 604, 607–08 (S.D.N.Y.1963), aff'd 449 F.2d 51, 78–79 (2 Cir. 1971); rev'd on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); *Fong v. United States,* 300 F.2d 400, 412–13 (9 Cir. 1962); *Peitzman v. City of Illmo,* 141 F.2d 956 (8 Cir.), cert. denied 323 U.S. 718, 65 S.Ct. 47, 89 L.Ed. 577 (1944); *Sarlie v. E. L. Bruce Co.,* 265 F.Supp. 371, 377–78 (S.D.N.Y.1967).

dealt with defaults caused by failure to make proper discovery.

Leading commentators reach conflicting results. One suggests that "the first sentence of Rule 54(c) may be thought of as expressing a simple, but important, principle—at any point in a case a defendant is entitled to determine his maximum liability, as fixed by the ad damnum as it stands at that point in the case, and decide whether he will proceed further. If he chooses not to, his liability cannot be increased. This principle seems applicable whether or not defendant appears at the damage hearing and therefore should not turn on when the default occurs." 10 Wright & Miller, Federal Practice and Procedure: Civil § 2663, p. 103. Another states that Rule 54(c) "applies whether there is a default for want of appearance or whether, having appeared, the defending party defaults due to a failure to plead or otherwise defend as provided by the rules", but adds, "where a hearing is had to determine the amount of unliquidated damages and the defendant participates at the hearing, the court, in the exercise of a sound discretion, may permit the claimant to amend his prayer for relief". 6 Moore's Federal Practice, ¶ 55.08, at p. 55–111 (footnotes omitted). See also *id.*, ¶ 54.-61.

Conclusion H. Assuming, without deciding, that this court has discretion to permit the amendment, the court concludes that it should not do so, primarily because plaintiffs can so easily bring another action to recover the "interest" and taxes which became due in 1975. The extent to which the judgment in this case will bind the parties on issues which may be raised in such a case need not be decided at this time.

Conclusion I. In view of Conclusions G and H, the judgment to be entered herein will include the instalment of "interest" under ¶ 8(h) of the Agreement which became due on December 31, 1974, with respect to Parcels B and C, in the amount of $36,720, with interest thereon at 6% per annum from December 31, 1974, until the date of final judgment herein.

V

Plaintiffs also seek to amend their complaint with respect to taxes, to allow them to assert a claim for "all damages sustained by Plaintiffs as a result of  *  *  Defendants' failure to pay the real property taxes on parcels B, C and D as provided in the Addendum to the Agreement". Defendants object on the same grounds that they object to the amendment with respect to "interest". Curiously, in light of the positions taken by the respective parties, they have stipulated "that there is due from Defendants to Plaintiff the amount of Thirteen Thousand One Hundred Sixty-Six Dollars and Ninety Six Cents ($13,166.96) in unpaid real estate taxes pursuant to the Agreement of June 23, 1972".

Conclusion J. The court will include the agreed amount in the final judgment to be entered.

Counsel should agree upon a final judgment giving effect to the rulings herein.