Frank G. **ROHAUER** and Suzanne M. Rohauer, Petitioners,

v.

Floyd D. **LITTLE** and Joyce G. Little, Respondents.

No. 85SC226.

Supreme Court of Colorado, En Banc.

April 27, 1987.

Dixon and Snow, P.C., Jerre W. Dixon, Denver, for petitioners.

Darrell S. Elliott, P.C., Denver, for respondents.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Linda K. Baker, First Asst. Atty. Gen., Denver, for amicus curiae, Colorado Real Estate Com'n.

Gorsuch, Kirgis, Campbell, Walker and Grover, John L. Ferguson, Denver, for amici curiae, Nat. Ass'n of Realtors and Colorado Ass'n of Realtors.

QUINN, Chief Justice.

We granted certiorari to review the decision of the court of appeals in *Little v. Rohauer*, 707 P.2d 1015 (Colo.App.1985), which held that the defendants-petitioners, Frank G. and Suzanne M. Rohauer, were liable to the plaintiffs-respondents, Floyd D. and Joyce G. Little, in the amount of $20,000 as liquidated damages for the Rohauers' breach of a real estate contract for the purchase of the Littles' home. In rejecting the Rohauers' claim that they were

excused from their contractual obligation due to the Littles' failure to furnish them with a title insurance commitment within the time required by the contract, the court of appeals held that the Littles satisfied their obligation by furnishing the title insurance commitment to a real estate salesperson employed in the office of the listing broker because, in the court of appeals' view, the real estate salesperson was an agent of the Rohauers. We hold that, in the absence of a written agreement authorizing the listing broker or salesperson to act on behalf of a purchaser, such broker or salesperson stands in an agency relationship to the seller only and not to the purchaser. We therefore reverse that part of the judgment which holds that the delivery of the title insurance commitment to the salesperson of the listing broker constituted delivery to an agent of the Rohauers. We, however, affirm that part of the judgment upholding the validity of the liquidated damages provision, and we direct that the case be returned to the trial court for the purpose of determining whether the Littles substantially performed their contractual obligation and thus rendered the Rohauers liable to them pursuant to the liquidated damages provision of the contract.

## I.

Floyd D. and Joyce G. Little entered into an exclusive listing agreement with the real estate brokerage firm of Coldwell Banker whereby Coldwell Banker, through its salesperson Dorothy Porter, undertook to sell the Littles' property in Arapahoe County, Colorado.[1] In June 1981, Rhonda Gorenz, another salesperson in the same Coldwell Banker office in which Porter was employed, received a telephone call from the employer of Frank G. Rohauer, informing her that Rohauer was moving from Houston, Texas, to Denver and would need assistance in finding a home. Gorenz telephoned Rohauer in Texas and obtained further information from him regarding his housing needs. After the conversation, Gorenz, in keeping with her normal practice, consulted the multiple listing service in order to find homes matching Rohauer's needs. Gorenz then made appointments to show several homes to Rohauer and his wife, and the Rohauers came to Denver for several days for that purpose. The first homes which Gorenz showed the Rohauers were those listed by Coldwell Banker, including the Littles' home. After several visits to the Littles' home, the Rohauers decided to make an offer to purchase it. Through conversations with Coldwell Banker's salesperson Dorothy Porter, Gorenz learned that the Littles would be willing to take less than the listed price of $525,000 if a cash contract could be obtained. She conveyed that information to the Rohauers, and a decision was made to make a cash offer of $400,000 for the property.

On June 18, 1981, Gorenz prepared a receipt and option contract incorporating the Rohauers' offer to purchase the Littles' property for $400,000 in cash or certified funds, of which $20,000 was to be tendered as earnest money. After obtaining Rohauer's signature on the receipt and option contract and his $20,000 check, Gorenz presented the contract to Porter, who in turn gave it to the Littles. The Littles rejected the offer, but informed Gorenz that they would be willing to sell their home for $425,000. This price, which was agreeable to the Rohauers, was written into the receipt and option contract, after which the Littles and Frank Rohauer initialed the changes and signed the contract.

The receipt and option contract acknowledged receipt of the $20,000 earnest money, to be held in escrow by Coldwell Banker as part payment for the property, and included the following provisions:

3. An abstract of title to said property, certified to date, or a current commitment for title insurance policy in an amount equal to the purchase price, at seller's option and expense, shall be furnished the purchaser on or before July 10, 1981. If seller elects to furnish said

---

1. Since the exclusive listing agreement is not part of the record on appeal, we do not know whether the agreement authorized Coldwell Banker to list the Littles' home with a multiple listing service.

title insurance commitment, seller will deliver the title insurance policy to purchaser after closing and pay the premium thereon.

\* \* \* \* \* \*

9. Time is of the essence hereof, and if any payment or any other condition hereof is not made, tendered or performed as herein provided, there shall be the following remedies. In the event a payment or any other condition hereof is not made, tendered or performed by the purchaser, then this contract shall be null and void and of no effect, and both parties hereto released from all obligations hereunder, and all payments made hereon shall be retained on behalf of the seller as liquidated damages. In the event that the seller fails to perform any condition hereof as provided herein, then the purchaser may, at his election, treat the contract as terminated, and all payments made hereunder shall be returned to the purchaser; provided, however, that the purchaser may, at his election, treat this contract as being in full force and effect with the right to an action for specific performance and damages.

The contract further provided that title to the Little property was to be in the name of Frank G. and Suzanne M. Rohauer. The closing date designated in the contract was July 20, 1981.

After the contract was executed, Rohauer encountered difficulties in obtaining the necessary financing for the purchase of the home. He discussed with Gorenz certain alternative proposals to modify the terms of the contract. In early July Gorenz relayed these proposals through Porter to the Littles' attorney. On July 12, 1981, Gorenz was notified that the proposed modifications were not acceptable to the Littles, and she relayed that information to the Rohauers.

In the meantime, Porter and Gorenz had taken steps to secure the title insurance commitment which, pursuant to the contract, was to be furnished to Rohauer on or before July 10, 1981. Porter received the commitment from Transamerica Title In-

surance Company at the Coldwell Banker office on July 7, 1981, and notified Gorenz of the receipt on the same date. The Rohauers, however, were not notified of the receipt of the title insurance commitment at this time and did not receive the commitment until a copy arrived by mail at their Houston home on July 15, 1981. By that time, the Rohauers had already stopped payment on their earnest money check and had advised Gorenz on July 14 that they were meeting with legal counsel and would probably not proceed with the purchase. The Rohauers failed to appear at the closing on July 20, 1981, and the Littles sold their home in November 1981 to other purchasers for $430,000.

The Littles brought suit against the Rohauers, claiming that the Rohauers had breached their contract by not proceeding with the closing and that they (the Littles) were entitled to the $20,000 earnest money as liquidated damages. The Rohauers defended on the basis that their duty of performance never arose, since the Littles had failed to furnish them with the title insurance commitment by July 10, 1981, as required by the contract.

The evidence presented at trial established that the exclusive listing agreement between the Littles and Coldwell Banker provided for a sales commission of seven percent, which was to be divided as follows: thirty percent of the commission to Gorenz, twenty-five percent of the commission to Porter, and the remaining forty-five percent to Coldwell Banker. It was undisputed that Gorenz had no formal agency arrangement with the Rohauers and that her compensation would be in the form of a share in the commission which the Littles paid to Coldwell Banker, the listing broker. Frank Rohauer testified that he had not authorized Gorenz to accept the title insurance commitment or to do anything else on behalf of himself or his wife in connection with the contemplated purchase of the Little home.

The trial court found that a valid contract had been formed, that the Rohauers had breached the contract, and that the Littles were thus entitled to the $20,000

earnest money deposit as damages. The court based its decision primarily on its determination that Gorenz "was the agent of the [Rohauers] to consummate all necessary acts in their behalf for the purchase of the residence" and that Gorenz was advised on July 7, 1981, "that a title commitment copy was available in the Coldwell Banker office where she worked." The Rohauers appealed, claiming that the trial court erred in finding that there was an agency relationship between them and Gorenz and in awarding the entire $20,000 to the Littles as liquidated damages. The court of appeals affirmed the judgment, and we granted certiorari to consider two issues: first, whether Rhonda Gorenz, a salesperson in the employ of Coldwell Banker, the listing broker, was acting as an agent of Rohauers, the purchasers, in connection with the sale of the Little home; and second, whether the $20,000 liquidated damages award in favor of the Littles was appropriate under the circumstances of this case.

## II.

The significance of the agency issue to the proper resolution of the case is obvious. If the court of appeals was correct in concluding that Coldwell Banker, through its salesperson Rhonda Gorenz, was the Rohauers' agent when the title commitment was delivered to Coldwell Banker on July 7, 1981, then the Littles complied with their contractual obligation and the Rohauers breached the contract by failing to proceed with the closing, since receipt of the title commitment by the agent would necessarily be imputed to the principal. If, on the other hand, Gorenz was not acting as an agent for the Rohauers, then the title commitment was not timely received by the Rohauers, with the result that the Littles would be in breach of the contract unless the delivery of the title commitment on July 15, 1981, five days prior to the scheduled closing, constituted substantial performance of the Littles' contractual obligation.

### A.

In *Stortroen v. Beneficial Finance Co.,* 736 P.2d 391 (Colo.1987), announced today, we considered whether the selling (or "cooperating") broker or salesperson—that is, a broker or salesperson not having a listing agreement with the seller but operating under a multiple listing service—stands in an agency relationship to the seller or the purchaser in connection with the sale of a house. We concluded that in a multiple listing real estate transaction involving residential property the selling broker or salesperson is an agent of the listing broker and is thus within a chain of agency to the seller. While the instant case involves a salesperson in the employ of the listing broker, there can be no question that an agency relationship exists between Rhonda Gorenz, the salesperson of the listing broker, and the Littles, the sellers. As we stated in *Stortroen,* the listing agreement creates a special agency between the seller and the listing broker by authorizing the broker "to find a ready, willing, and able purchaser for the listed property on terms acceptable to the seller," and

> [b]ecause it is customary for a real estate broker to employ salespersons to deal with prospective purchasers of the listed property, the authority given to the broker by the listing agreement will generally include the implied authority to appoint these salespersons as subagents to perform the tasks assigned to the broker by the listing agreement.

*Id.* at 396, citing *Rosenthal v. Art Metal, Inc.,* 95 N.J.Super. 8, 229 A.2d 676 (1967); *Restatement (Second) of Agency* § 80 (1957).

A proper resolution of this case turns on whether, notwithstanding the agency relationship existing between the salesperson of the listing broker and the sellers, an agency relationship may also exist simultaneously between the salesperson of the listing broker and the purchasers. In addressing this problem in the context of a residential real estate sale, we observed in *Stortroen* that "Colorado law prohibits a real estate broker or salesperson from simultaneously representing both the seller and the purchaser in the same transaction

unless written disclosure of such dual representation is given to the seller and the purchaser and they consent in writing to the dual agency arrangement." 736 P.2d at 400, citing § 12–61–113(1)(d), 5 C.R.S. (1985); Real Estate Comm'n Rule E–32, 4 C.C.R. 725–1, at 7.05b; Colo. Real Estate Comm'n, *Real Estate Manual*, ch. VIII, at 4. The rules of the Colorado Real Estate Commission contemplate the possibility of a dual agency only where there is an agency contract between the purchaser and the real estate licensee, full written disclosure is given to all parties to the transaction, and the parties consent in writing to the dual arrangement. Rule E–32 provides in this respect as follows:

> When a licensee represents a purchaser or lessee of real property pursuant to an agency contract, he shall not function simultaneously as the agent of the owner or the subagent of a licensed broker who represents an owner unless written disclosure is made and express written consent is given by all parties to the transaction. The written disclosure shall state that the licensee is acting as agent for both the purchaser or lessee and the owner, and shall identify the source and nature of the compensation to be paid the licensee.

4 C.C.R. 725–1, at 7.05b.

The potential conflicts of interest inherent in dual representation are obvious. Information concerning the lowest price a seller might accept would clearly be useful to a prospective purchaser, but the disclosure of that information to the purchaser by a broker or salesperson would not be in the seller's interests since it would clearly enable the purchaser to avoid "over-bidding." So too, although a purchaser might benefit from knowing that a seller is soon to be forced into foreclosure and might thus be willing to accept less than fair market value for the house, a failure to disclose such information to the purchaser could render the broker or salesperson liable to the purchaser. On the other hand, disclosure to the purchaser of this information would clearly render the broker or salesperson liable to the seller for breach of the fiduciary duty of loyalty.

The potential conflicts of interest on dual representation lead us to conclude that in the absence of written disclosure of the dual agency and the express written consent of all parties to the transaction, a salesperson of the listing broker may not simultaneously represent both the seller and the purchaser in the same real estate transaction. In the absence of such disclosure and consent, the salesperson of the listing broker is an agent of the seller only and not an agent of the purchaser. We hasten to add that the absence of an agency relationship between the purchaser and the salesperson of the listing broker will not necessarily leave the purchaser unprotected in his dealings with the salesperson. Our observation in *Stortroen* that "[a] selling broker or salesperson may be held liable for wrongful acts causing damage to a third person," *Stortroen*, 736 P.2d at 400, applies with equal force to a salesperson of a listing broker who in functioning as agent of the seller fails to deal fairly and honestly with the purchaser.

### B.

Applying this principle to the facts of this case, we have no hesitation in concluding that the court of appeals erred when it found that Rhonda Gorenz, a salesperson of the listing broker Coldwell Banker, was an agent of the Rohauers. The Coldwell Banker brokerage, including its salesperson Rhonda Gorenz, stood in an agency relationship to the Littles by virtue of the exclusive listing agreement. Gorenz's efforts in assisting the Rohauers in finding and in making an offer on the Littles' home were actions undertaken by Gorenz as a salesperson-agent of the Coldwell Banker brokerage which had the exclusive listing agreement with the Littles. Since the Rohauers never gave written consent to Gorenz to act as their agent in connection with their contemplated purchase of the Little home, Gorenz was not acting as their agent when she received the title insurance commitment at Coldwell Banker's office on July 7, 1981.

### III.

The effect of the lack of any agency relationship between Rhonda Gorenz and

the Rohauers is that her receipt of the title insurance commitment at Coldwell Banker's office on July 7, 1981, did not constitute compliance with the contractual requirement imposed on the Littles to furnish the Rohauers with a title insurance commitment on or before July 10, 1981. The Rohauers, however, did receive the title insurance commitment on July 15, 1981, which, although five days later than the July 10 deadline, was nonetheless still five days prior to the scheduled closing date of July 20, 1981. This receipt by the Rohauers of the title insurance commitment arguably provided them with adequate time in which to assure themselves of the merchantability of the title.[2] Since the parties did not address this aspect of the case in their briefs, it is necessary to return the case to the trial court for the purpose of determining whether the July 15 delivery of the title insurance commitment to the Rohauers constituted substantial performance by the Littles of their contractual obligation.

We recognize that where a contract unequivocally conditions the purchaser's performance on the seller's undertaking to provide a title insurance commitment, the failure of the seller to strictly comply with the condition will excuse the purchaser's duty of performance under the contract. *See Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 61 N.Y.2d 106, 460 N.E.2d 1077, 472 N.Y.S.2d 592 (1984) (seller's obligation to furnish title insurance policy and mortgage confirmation was construed as a condition rather than a promise, where the requirements were contained in a section of the contract entitled "Conditions Precedent to Purchaser's Obligation to Close"). Where, however, there is doubt as to whether a contractual provision is intended as a promise or a condition, it is preferable to construe the provision as a promise, thereby avoiding the potentially

harsh effects of a forfeiture that can result in some cases by a contrary construction. *Charles Ilfeld Co. v. Taylor*, 156 Colo. 204, 209, 397 P.2d 748, 750 (1964); *Restatement (Second) of Contracts* § 227 and comment d (1979); E. Farnsworth, *Contracts* § 8.4, at 550 (1982).

In the instant case, paragraph three of the contract states that an abstract of title or a title insurance commitment "shall be furnished the purchaser on or before July 10, 1981." This contractual language is similar to provisions which other courts have construed as a promise by the party under obligation to perform rather than as a condition precedent to the other party's obligation. *See, e.g., Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441 (9th Cir. 1986) ("title to ... equipment shall pass to lessor upon installation" construed as a promise rather than a condition); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001 (3d Cir.1980) (provision in loan commitment that "[borrowers] will furnish evidence ... that there has been no material adverse change in our financial or other condition" not a condition precedent to contractual obligation of lending institution to purchase loan); *Growth Properties, Inc. v. Klingbeil Holding Co.*, 419 F.Supp. 212 (D.Md.1976) ("purchaser to submit completed development plans" construed as a promise rather than a condition). Although paragraph nine of the contract refers to the remedies available to one party upon the other party's failure to make payment or to perform "any other condition," we cannot say with fair assurance that the contracting parties in this case intended the provision regarding the furnishing of a title insurance commitment on or before July 10, 1981, as an express condition precedent, the failure of which would result in a forfeiture of the sellers' rights under the contract even though the furnishing of the title insurance commitment might well have been within the time required for the purchasers to adequately prepare for closing. Given the uncertainty as to whether

---

**2.** In *Allison v. Schuber*, 74 Colo. 545, 223 P. 53 (1924), the court considered the meaning of a contractual provision in a real estate installment contract, which required the seller to furnish the purchaser an abstract showing merchantable title in the seller but did not specify a date for compliance. The court held that the seller was required to furnish the abstract within a reasonable time, and that a reasonable time meant "at least early enough to permit examination before [the first] payment." 74 Colo. at 546–47, 223 P. at 53.

the parties intended the contractual provision regarding the title insurance commitment as a condition precedent to the purchasers' contractual obligations or as a promise, we elect to construe that provision as a promise.

Under the doctrine of substantial performance, a party may recover on a contract when that party has performed all the major aspects of the contract but has deviated in insignificant particulars that do not detract from the benefit which the other party would derive from a literal performance. *See, e.g., Newcomb v. Schaeffler*, 131 Colo. 56, 279 P.2d 409 (1955); *Louthan v. Carson*, 63 Colo. 473, 168 P. 656 (1917).[3] Whether performance is "substantial" is generally a question of fact that depends on the particular circumstances of the case. Farnsworth § 8.12, at 591. If the trial court finds that the Littles did not substantially perform their promise with respect to the furnishing of a title insurance commitment to the Rohauers, it then follows that the Rohauers were legally justified in stopping payment on their earnest money check and in failing to appear at the closing on July 20, 1981. *See, e.g., Restatement (Second) of Contracts* § 227, comment d, at 178–79; 3A *Corbin on Contracts* § 634, at 34 (1960). Since the Littles would not be entitled to any recovery from the Rohauers under those circumstances, the question of the appropriateness of the liquidated damages award would become moot. On the other hand, if the trial court determines that the Littles did in fact substantially perform their promissory obligation to furnish a title insurance commitment to the Rohauers, it would then follow that the Rohauers' failure to close the sale breached the contract and the Littles would be entitled to damages. We thus elect to address the appropriateness of the liquidated damages award in the event this issue is reached by the trial court on remand.

## IV.

The Rohauers contend that, even if they are contractually liable to the Littles, the trial court erred in enforcing the liquidated damages provision of the contract since the $20,000 earnest money greatly exceeded any actual damages suffered by the Littles. We are unpersuaded by their claim.

■ Unless the contract on its face establishes that the stipulated liquidated damages are so disproportionate to any possible loss as to constitute a penalty, the party challenging the liquidated damages provision bears the burden of proving that fact. *Chisholm v. Reitler*, 143 Colo. 288, 352 P.2d 794 (1960); *Jobe v. Writer Corp.*, 34 Colo.App. 240, 526 P.2d 151 (1974). The factors to be considered in determining whether an amount designated as liquidated damages is in reality a penalty, rather than a reasonable estimate of actual damages, are: (1) whether the parties intended to liquidate damages; (2) whether the amount of liquidated damages, when viewed as of the time the contract was made, was a reasonable estimate of the presumed actual damages that the breach would cause; and (3) whether, when viewed again as of the date of the contract, it was difficult to ascertain the amount of actual damages that would result from a breach. *O'Hara Group Denver, Ltd. v. Marcor Housing Systems, Inc.*, 197 Colo. 530, 595 P.2d 679 (1979); *Perino v. Jarvis*, 135 Colo. 393, 312 P.2d 108 (1957); *H.M.O. Systems, Inc. v. Choicecare Health Services, Inc.*, 665 P.2d 635 (Colo.App.1983); *see* Farnsworth § 12.18, at 898.

■ In this case, we agree with the court of appeals that the liquidated damages provision was legally enforceable.

---

**3.** Section 241 of the *Restatement (Second) of Contracts* (1979) states:

In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Nothing in the record suggests that the parties did not intend the $20,000 earnest money to be retained by the sellers as liquidated damages in the event of a breach by the purchasers. Nor can we conclude that the stipulated amount of $20,000 was an unreasonable estimate of the actual damages likely to be incurred by the sellers as a result of the purchasers' breach of a $425,000 contract. When the contract was made it was not unreasonable for the parties to anticipate that if the sale to the Rohauers did not go through, it could take several months—during which the Littles would have to make mortgage and tax payments and maintain the property—before a new buyer could be found.[4] Finally, it cannot be said as a matter of law that as of the date of the contract the amount of actual damages likely resulting from a breach was readily ascertainable. Although the Rohauers argue that the Littles' actual damages or net loss could have been easily calculated by subtracting from the Littles' expenses incurred as the result of the Rohauers' failure to close the additional $5,000 obtained by the Littles in the sale of their home in November 1981, this argument misses the mark. It is the difficulty in ascertaining damages at the time of the contract, not afterwards, that is relevant for purposes of enforcing a liquidated damages provision. That difficulty was quite obvious in this case.

### V.

In summary, we reverse that part of the judgment which holds that an agency rela-

tionship existed between the Rohauers and Rhonda Gorenz, the salesperson for the Coldwell Banker brokerage, and we affirm that part of the judgment upholding the liquidated damages clause in the contract. If the trial court on remand determines that the Littles substantially performed their contractual duties, then the liquidated damages provision should be enforced.

The judgment is thus affirmed in part and reversed in part, and the cause is remanded to the court of appeals with directions to return the case to the trial court for further proceedings not inconsistent with the views herein expressed.

---

**4.** Floyd Little testified at trial that he did in fact incur expenses in the form of maintenance costs, mortgage and property tax payments, and trips back to Colorado from his new home in California during the time between July 20, 1981, and November 17, 1981, when the property was sold to a different buyer. Although no total figure is given, these expenses appear to have been significant, if not as much as $20,000.

In taking note of actual damages as we assess the reasonableness of the parties' original estimate of damages, we are not suggesting that proof of actual damages is indispensable to the enforceability of a liquidated damages provision. While we are aware that there is authority to support the position that a liquidated damages provision should not be enforced when actual damages are either nonexistent or grossly disproportionate to the amount fixed as liqui-

dated damages, *see, e.g.,* Farnsworth § 12.18, at 900–01, we do not decide that issue here, since we do not consider this to be such a case. We do, however, recognize that evidence of actual damages may be relevant to show that the original estimate was or was not reasonable. Although some cases have simply indicated that a liquidated damages provision is enforceable in the absence of proof of actual damages without discussing the reasonableness of the original damages estimate, *see Esecson v. Bushnell,* 663 P.2d 258 (Colo.App.1983); *Lundstrom v. Hackl,* 40 Colo.App. 322, 579 P.2d 85 (1978), we emphasize that the enforceability of a liquidated damages provision must be ascertained by considering the three factors set forth herein to determine whether or not the provision amounts to a penalty.