## No. C-1656

**The O'Hara Group Denver, Ltd. and the First National Bank of Englewood v. Marcor Housing Systems, Inc.**

(595 P.2d 679)

Decided May 21, 1979.                    Rehearing denied June 11, 1979.

532

Banta & Eason, P.C., Stephen G. Everall, William K. Malone, for petitioners

Ireland, Stapleton & Pryor, P.C., William C. Jensen, James C. Ruh, for respondent.

*En Banc.*

MR. JUSTICE ERICKSON delivered the opinion of the Court.

We granted certiorari to review the decision of the court of appeals in *Marcor Housing Systems, Inc. v. First American Title Co.,* 41 Colo. App. 90, 584 P.2d 86 (1978). We affirm in part, reverse in part, and return this case to the court of appeals with directions to remand to the district court for a new trial on the issues set out in this opinion.

## I.
### The Facts

In April of 1974, the seller, Marcor Housing Systems, Inc. ("Marcor") and the buyer, O'Hara Group, a California corporation ("O'Hara California"), entered into two contracts for the purchase and sale of two commercial properties, denominated "Greens" and "Commercial." As a part of this agreement, O'Hara California deposited $100,000 in an escrow account with the First American Title Company ("Title Company"). The escrowed funds were designated as liquidated damages to be paid to Marcor in the event O'Hara California failed to perform its obligations under the contract.

O'Hara California borrowed the $100,000 from the First National Bank of Englewood ("Bank"). In return, the Bank received as "security . . . to insure the prompt payment" of the debt, all of O'Hara California's "right, title and interest as buyer in and to" the contracts to purchase.

Closing was to take place within six months after the contracts to purchase the properties were signed. O'Hara California experienced financial difficulties, and an extension was granted by Marcor until January of 1975. As that date approached, it became apparent that O'Hara California would be unable to secure financing. Marcor again granted an extension, this time until March 20, 1975. In order to enable the purchase and sale to take place, Marcor also agreed to the substitution of a new entity, the O'Hara Group Denver ("O'Hara Denver") as purchaser of the

property. The managing corporate officers of O'Hara Denver were substantially the same as those who made up the officers of O'Hara California. As consideration for the agreement for an extension and substitution of O'Hara Denver for O'Hara California, O'Hara Denver was required to escrow an additional $25,000 with the Title Company. The Bank did not provide the additional funds which were required of O'Hara Denver, but O'Hara Denver acquired the funds to obtain the extension.

At the time that O'Hara Denver was substituted for O'Hara California, new contracts were entered into between Marcor and O'Hara Denver. The new contracts superseded the original agreements to purchase which had been signed by Marcor and O'Hara California. The new contract related to the same properties, but the Commercial parcel was divided into two parts, and the liquidated damage deposit, which now totaled $125,000, was allocated between the various panels.

The Bank did not receive a new written assignment of a security interest in the contracts to purchase from O'Hara Denver. Thus, once the second set of contracts were entered into, the Bank had a written assignment only from O'Hara California, which was no longer a party to the agreements. However, the Bank has asserted that, at the time of the substitution of parties, it received an oral assignment[1] from O'Hara Denver, and that Marcor was aware of that assignment. The Bank subsequently received a written assignment from O'Hara Denver. That assignment was made after the salient facts which gave rise to this litigation had occurred and after litigation was commenced.

O'Hara Denver did not appear at the March 20, 1975, closing, because it was unable to obtain financing. Testimony at trial indicated that on the morning of the scheduled closing, an official of O'Hara Denver contacted representatives of Marcor and informed them that O'Hara Denver would not attend the closing. However, the trial court made no findings in this regard and specifically did not find that the alleged conversation constituted a breach on the part of O'Hara Denver. In any event, the failure of O'Hara Denver to appear at closing was a breach of contract. *Mitchell v. Evans,* 150 Colo. 568, 375 P.2d 101 (1962).

Marcor immediately made demand upon the Title Company for the liquidated damages held in escrow. This litigation followed, and O'Hara Denver was made a defendant. After litigation commenced, and some six months after the aborted closing, O'Hara Denver asserted that the title which Marcor had been prepared to offer at closing was defective. O'Hara Denver contends that for this reason its breach of the contracts to purchase was excused. O'Hara Denver demanded the return of the escrowed funds.

---

[1] No question was raised as to the application of the Statute of Frauds.

The Bank made several attempts to intervene in the subsequent lawsuit between O'Hara Denver and Marcor. Their motions to intervene were denied. The propriety of those denials is discussed in Part V of this opinion, *infra*.

## II.
### *Liquidated Damages*

■ The first issue which we reach on appeal is the contention of O'Hara Denver that the liquidated damages provided for in the agreements to purchase are in the nature of a penalty. The factors to be considered in determining whether an amount designated as liquidated damages for breach of a contract is in reality a penalty are: (1) whether the parties intended to liquidate damages; (2) whether the amount of liquidated damages, when viewed from the time of contracting, was a reasonable estimate of the presumed actual damages that breach of the contract would cause; and (3) whether, when viewed from the time of contracting, it was difficult to ascertain the amount of actual damages that would result from breach. *Perino v. Jarvis,* 135 Colo. 393, 312 P.2d 108 (1957).

■ The trial court heard expert testimony on these issues and found that, at the time the contracts were signed, it would have been difficult to ascertain the actual damages which would flow from breach, and that $125,000 was a reasonable forecast of the damages that would occur and reflected reasonable compensation for Marcor's actions in keeping the properties off the market.

We will not disturb these findings on appeal. *Briano v. Rubio,* 141 Colo. 264, 347 P.2d 497 (1959). The trial court also found, on the basis of the contracts, that the parties intended to liquidate damages. Since all elements of a valid contract to liquidate damages were present we concur in the trial court's decisions in this regard.

## III.
### *The Contracts*
### *A. Essential Terms of the Agreement.*

O'Hara Denver asserts that the contracts which support the transaction are void. First, it contends that the parties did not agree on all the essential terms of the contract. Second, it argues that the contracts are void for "lack of mutuality of obligation."

O'Hara Denver contends that the contemplated purchase of the Greens and Commercial properties was part of a broader agreement between it and Marcor to develop the properties after the sale and purchase. It asserts that the development plans were discussed only in general terms and that the failure of the parties to the contract to finalize their agreement so far as it related to development means that the parties had only "agreed to agree in the future" on an essential term of the contract. *CF. Ward v. Ward,* 94 Colo. 275, 30 P.2d 853 (1954).

■ The trial court found that the agreements to purchase related to: "[P]arcels of land [which] were to be transferred for definite consideration on a date certain. . . . The Purchase Agreements contained all the essential elements of a contract and are not simply agreements to agree but in every sense legally binding contracts between the parties."

Thus, in effect, the trial court found that the parties considered future development of the properties to be "collateral to the properties' transfer and sale." *Marcor Housing Systems, Inc. v. First American Title Co.,, supra,* at 88. We cannot say that the trial court's finding was clearly erroneous, *see Briano v. Rubio, supra,* and for that reason, we affirm the trial court.

### B. Mutuality of Obligation.

■ According to the terms of the agreements to purchase, if O'Hara Denver failed to perform, the liquidated damages escrowed with the Title Company were to become the property of Marcor. Those same agreements provided, however, that if Marcor were to "fail or refuse to perform the obligations required to be performed by it on or prior to the Closing Date," the funds held in escrow were to be returned to O'Hara Denver. The contracts further provided that, in the event of Marcor's breach, "this agreement shall then be null and void and neither party shall have any further obligations hereunder."

O'Hara Denver contends that this last clause deprives it of any legal remedy in the event of Marcor's breach and that this lack of remedy renders Marcor's promise to perform illusory and, hence, insufficient consideration to support a contract. *Cf., Gould v. Rite-Way Company,* 143 Colo. 65, 351 P.2d 849 (1960); *Monroe v. Martin,* 137 Ga. 262, 73 S.E. 341 (1911).

The trial court held that Marcor's right to refuse to perform its obligations under the agreements to purchase was limited by an implicit requirement that it act in "good faith." However, we need not decide whether such a requirement so limited Marcor's freedom of action that consideration for its promise was present. *Compare Jay Dreher Corp. v. Delco Appliance Corp.,* 93 F.2d 275 (2nd Cir. 1937) (L. Hand, J.), *with Monroe v. Martin, supra. See also* 3A A. Corbin, *Contracts* § 762 (1960). We agree with the court of appeals that certain actions taken by Marcor pursuant to the contracts provided sufficient consideration to validate those agreements. Specifically, Marcor withheld the commercial properties from the market for some eleven months, extended the closing date on two occasions, and allowed O'Hara Denver to enter on the properties in order to conduct engineering studies. By these actions, Marcor incurred a sufficient detriment to provide consideration for the contracts to purchase. *See Stanton v. Union Oil Co.,* 111 Colo. 414, 142 P.2d 285 (1943).

## IV.
### Marketable Title

According to the terms of the agreements to purchase, Marcor obligated itself to convey to O'Hara Denver "fee simple . . . and marketable title" to the Greens and Commercial properties. This obligation was modified only by an exception for "easements and restrictions of record which do not materially interfere with buyer's development of the Property. . . ."

■ Marcor has conceded that the title which it was prepared to convey at the March 20, 1975, closing was encumbered by a reservation of mineral rights in a third person. A reservation or exception of mineral rights renders a seller's title unmarketable. *Rule v. Link,* 84 Colo. 82, 267 P. 1005 (1928) *Eychaner v. Springer,* 34 Colo. App. 412, 527 P.2d 903 (1974). The defect on Marcor's title was never cured. Such a defect relieves the buyer of his obligation to purchase the property and destroys the seller's right to recover liquidated damages, *Eriksen v. Whiteskarver,* 57 Colo. 409, 142 P. 413 (1914), absent some countervailing legal or equitable principle. *Platte Land Co. v. Hubbard,* 12 Colo. App. 465, 56 P. 64 (1899).

■ There is a countervailing principle of sufficient weight in this case to excuse the seller's obligation. The trial court found that Marcor delivered title commitments on the Commercial and Greens properties to O'Hara Denver thirteen days before closing. O'Hara Denver did not object to the reservation of mineral rights in the time period between delivery of those commitments and closing. Since O'Hara Denver did not appear at closing, it did not object to the defects in Marcor's title at that time. Indeed, as noted above, O'Hara Denver made no objections at all until the commencement of this litigation. O'Hara Denver's failure to close was caused by its inability to obtain financing, a matter unrelated to the title defects. In such circumstances, it would have been a futile gesture to require Marcor to cure the defect in its title after O'Hara Denver's breach of the agreement. *Doyle v. Miles,* 74 Colo. 182, 219 P. 1068 (1923); *Cohen v. Kranz,* 12 N.Y.2d 242, 189 N.E.2d 473, 238 N.Y.S.2d 928 (1963). A tender and demand on the part of the buyer is essential where the defect in the seller's title could have been cleared. There was none here.

■ The final question is whether the defects in Marcor's title were curable or incurable. Those defects in the seller's title which are curable come within the rule of *Doyle v. Miles, supra. See Earlin v. Mors,* 1 N.J. 336, 63 A.2d 531 (1940). If the defects in the seller's title are incurable, however, a breach by the buyer is excused, because the seller could not have performed and could not have put himself in a position to perform. *Bertrand v. Jones,* 58 N.J.Super. 273, 156 A.2d 161 (1959), *cert. denied,* 31 N.J. 553, 158 A.2d 452 (1960).

In this case, no evidence was presented at trial on the question whether the defect in Marcor's title was curable or incurable. The exception of mineral rights under the circumstances of this case may not be an incurable defect. *Compare Bertrand v. Jones, supra.* As such, we are of the opinion that in order to justify failure to appear at the closing, the burden lay with O'Hara Denver to demonstrate that it would have been impractical or impossible for Marcor to have cured the defect in its title. Such a requirement will encourage defaulting purchasers to either appear at the closing or give advance notice of those defects on which they intent to rely to excuse their breach. A contrary rule would encourage a buyer who breached his contract to search out technical defects in a seller's title which could have been cured had the seller been given notice of their existence. Requiring a seller to prove that his defects were curable would be tantamount to requiring him to cure them. "The possibility and likelihood of correction constitutes the principal basis of the rule." *Doyle v. Miles, supra,* at 183. The failure of O'Hara Denver to appear at closing or to make objections to the state of Marcor's title until Marcor attempted to collect liquidated damages places the burden on O'Hara Denver to show that the defects could not have been cured by Marcor within a reasonable time. *See Mitchell v. Evans, supra.* The burden rests with the party who is seeking a belated excuse for nonperformance. Since O'Hara Denver did not sustain its burden of demonstrating that the defect in Marcor's title was incurable, Marcor's failure to prepare to deliver marketable title at closing was excused.

## V.
### *Intervention*

C.R.C.P. 24(a) provides:

"*Intervention of Right.* Upon timely application anyone shall be permitted to intervene in an action: (1) When a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

The Bank filed three motions relating to its desire to intervene. The first was based on the assignments it had received from O'Hara California as security for its loan to O'Hara California of the escrowed funds. Marcor objected to this motion on the ground that, since O'Hara California was no longer a party to the contested contracts, the Bank could not "claim an interest" in these funds. The district court denied the motion.

The second motion was premised on the assignment which the Bank obtained from O'Hara Denver after the commencement of this action. That motion was also denied.

The third motion, which was filed in mid-trial, was styled ''Motion . . . for Reconsideration of Denial of Motion to Intervene.'' It sought reconsideration of the district court's denial of the first motion to intervene. The Bank contended that the first motion, based on the security interest it had received from O'Hara California, had been given new life by testimony elicited at trial, which indicated that Marcor considered O'Hara Denver and O'Hara California to be "one and the same" entity. That motion was also denied. The first two motions to intervene were not appealed within thirty days after their denial. *See* C.A.R. 4(a). The denial of the third motion was appealed in a timely manner.

Marcor has contended that the failure of the Bank to appeal the denial of its first two motions within thirty days precludes appellate review of those denials. *Chapman v. Miller,* 29 Colo. App. 8, 476 P.2d 763 (1970). It also contests the validity of the Bank's motion for reconsideration, on the ground that a party should not be allowed to cure his failure to prosecute a timely appeal by raising substantially the same issues in a subsequent pleading. *Cf., Federal Lumber Co. v. Hanley,* 33 Colo. App. 18, 515 P.2d 480 (1973). Finally, Marcor contends that the Bank's motions to intervene were properly denied on the merits, because the Bank's interests in this transaction were not "as a practical matter," impaired by its exclusion from this litigation, and because the Bank's interests were adequately represented at trial by O'Hara Denver.

The court of appeals refused to reach any of these issues, because it concluded that the Bank's failure to make a motion for new trial after the denial of its motions to intervene deprived the court of appeals of jurisdiction to consider the matter on review. It reached this conclusion on the basis of our opinion in *Rowe v. Watered Down Farms,* 195 Colo. 152, 576 P.2d 172 (1978). We held in *Rowe v. Watered Down Farms* that:

"[A] motion for a new trial is a jurisdictional prerequisite for appellate review of a grant or denial of C.R.C.P. 60(b) motion when there has been a hearing involving controverted issues of fact. We interpret the phrase 'not involving controverted issues of fact' in C.R.C.P. 59(h) to pertain to hearings in which the underlying facts and circumstances are not in dispute. *See Colorado State Board of Social Services v. Billings,* 175 Colo. 380, 487 P.2d 1110. The court of appeals adopted a more expansive view and found 'controverted issues of fact' to exist when different inferences and conclusions could be drawn from undisputed facts. We disapprove of this test because of the difficulties in application it presents."

The court of appeals held that a motion for new trial was also a prerequisite to an appeal of a denial of a motion to intervene as of right. We express no opinion as to whether a motion for new trial need be made after denial of a motion to intervene, when that motion to intervene is predicated on "controverted issues of fact." The case before us presents no such problem. All of the documents which underlay the first two motions

to intervene were accepted in their proffered form by the parties. In addition, there was no disagreement among the parties as to the content of the statements which were made at trial by Marcor's representatives and which were urged as support for the motion for reconsideration. The only controversy as to these motions related to the interpretation to be given the facts before the trial court. A dispute of that nature does not necessitate the making of a motion for new trial pursuant to C.R.C.P. 59(f) and (h). *Rowe v. Watered Down Farms, supra.* Thus, we conclude that the court of appeals had jurisdiction to hear those matters pertaining to intervention and should have considered them.

■ The next question presented is whether the Bank prosecuted its appeal from the denial of its motions to intervene in a timely manner. The denial of a motion to intervene as a matter of right is a final and appealable order. *See Sam Fox Publishing Co. v. United States,* 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961). But the conclusion that such a denial is a final and appealable order does not answer the question of whether the intervenor must appeal at the time his motion is denied, or whether he may delay his appeal until final judgment is rendered in the litigation in which he seeks to intervene. That conclusion also leaves unanswered the question whether a partial judgment, pursuant to C.R.C.P. 54(b), must be entered before an appeal may be taken. *Compare Dickinson v. Petroleum Conversion Corp.,* 338 U.S. 507, 70 S.Ct. 322, 94 L.Ed. 299 (1950), *with* C.R.C.P. 54(b).

However, we need not decide this troublesome question. Although the first two motions to intervene were not appealed within thirty days after they were denied, we are of the opinion that the Bank's motion to reconsider the denial of its first motion to intervene was, as a practical matter, a new and independently viable motion to intervene. Since the denial of that motion was appealed within the time limits imposed by C.A.R. 4(a), the question of the Bank's right to intervene is properly before us.

■ This is not a case in which an appeal has been taken from the denial of a motion which was based on substantially the same grounds as an earlier rejected but unappealed motion or on facts known to the moving party at the time the original motion was made. *See Federal Lumber Co. v. Hanley, supra,* at 20. Rather, the Bank's motion for reconsideration was based on information newly made available to it at trial. The allegation that Marcor regarded O'Hara Denver, the defendant in this case, to be the same entity as O'Hara California, the assignor of the Bank's rights under the first set of contracts, presented a wholly new question to be resolved by the trial court. Consequently, the motion for reconsideration constituted a new motion to intervene, and the refusal of the trial court to allow the Bank to intervene is properly before us for review.

■ Finally, we turn to the merits of the Bank's motion to intervene. The trial court denied that motion on the ground that the Bank did

not "claim an interest relating to the transaction," which formed the basis for this lawsuit. But the Bank was clearly in a position to claim such an interest — it was, after all, the Bank which provided the funds which are the subject of this litigation. The existence of the interest of a proposed intervenor should be determined in a liberal manner. *Dillon Co. v. Boulder,* 183 Colo. 117, 515 P.2d 627 (1973).

The problems which may arise from an attempt to focus solely on the formalism inherent in the term "interest" are made apparent from the case before us. The ruling of the trial court,

"made to avoid delay, complications, or expense turns out to have generated more of its own . . . . All of this becomes the more ironic, if not unfortunate, since the intervenor and [Marcor] sparring over why intervention ought or ought not to have been allowed, each try to persuade us that one was bound to win, the other lose on the merits which each proceeds to argue as though the parties were before or in the court." *Atlantis Development Corp. v. United States,* 379 F.2d 818 (5th Cir. 1967).

The rules of procedure are to be "liberally construed to secure the just, speedy, and inexpensive determination of every action." C.R.C.P. 1(a). It is the better practice to apply the rule relating to intervention in such a way that, whenever possible and "compatible with efficiency and due process," *Smuck v. Hobson,* 408 F.2d 175 (D.C. Cir. 1969), issues relating to the same transaction can be resolved in the same lawsuit and at the trial court level. *See, e.g., Dillon Co. v. Boulder, supra.*

"The effort to extract substance from the conclusory phrase 'interest' or 'legally protected interest' is of limited promise. . . . [I]n the context of intervention the question is not whether a lawsuit should be begun, but whether already initiated litigation should be extended to include additional parties. . . . '[A] more instructive approach is to let our construction be guided by the policies behind the 'interest' requirement. * * * [T]he 'interest' tests is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.'

. . . .

"This does not imply that the need for an 'interest' in the controversy should or can be read out of the rule. But the requirement should be viewed as a prerequisite rather than relied upon as a determinative criterion for intervention. If barriers are needed to limit extension of the right to intervene, the criteria of practical harm to the applicant and the adequacy of representation by others are better suited to the task. If those requirements are met, the nature of his 'interest' may play a role in determining the sort of intervention which should be allowed — whether, for example, he should be permitted to contest all issues, and whether he should enjoy all the prerogatives of a party litigant." *Smuck v. Hobson,*

*supra.* (Footnote omitted.)

Once an intervenor can point to an "interest relating to the transaction" which is the basis of the ongoing lawsuit, it should be allowed to participate if it appears that all of its interests may not be adequately represented by those already parties to that lawsuit. *Smuck v. Hobson, supra.* If the intervenor's claims prove to be without foundation, then, of course, judgment may be entered against it. But that determination should be based on the merits of the claims, as tested at trial.

Against this background, the questions posed by C.R.C.P. 24(a)(2) in this litigation are intertwined. The Bank's ability "as a practical matter" to protect its interests are dependent upon the ability of O'Hara Denver to "adequately represent" those interests. *Atlantis Development Corp. v. United States, supra.* The answer to these questions will in turn shape the extent to which the intervenor may participate in the ongoing litigation.

In this case, the interests of the Bank and O'Hara Denver are to a large degree coincident. O'Hara Denver has at least as great a stake in this controversy as does the Bank. But such considerations do not end the inquiry mandated by C.R.C.P. 24(a).

With regard to several of the major issues presented in this case, O'Hara Denver can fully represent the interest of the Bank. The questions, whether the title which Marcor was prepared to offer was defective, what are the consequences of O'Hara Denver's failure to appear at the closing, and whether the contracts signed by the parties were void for lack of consideration, were all ably litigated in the trial below at O'Hara Denver. The Bank would not have profited from being allowed to litigate those issues independently.

However, the Bank has available to it several arguments which could not be asserted by O'Hara Denver. Specifically, the Bank has contended that, by virtue of its assignments from O'Hara California, and the nature of the relationship between O'Hara California and both O'Hara Denver and Marcor, Marcor's title commitments should have been delivered to the Bank. The Bank contends that it should have been allowed to protest an allegedly untimely tender of the title commitments by Marcor and the presence of the mineral exceptions in those commitments. The Bank attempted to attend the aborted closing, but its efforts were rebuffed by Marcor. The Bank asserts that it should have been allowed to attend the closing and, thus, pose timely objections to the state of Marcor's title. Moreover, the Bank contends that its interests in the escrowed funds may take precedence over the demands of Marcor.

We intimate no opinion as to the validity of these assertions. It may be that the Bank's claims are worthless. But those claims are better tested in the crucible of trial and of argument before the trial court than in motions based solely on the pleadings. *Atlantis Development Corp. v.*

*United States, supra.* Once an intervenor can point to an "interest relating to the transaction" which is the basis of the ongoing lawsuit, it should be allowed to participate if it appears that all of its interests may not be adequately represented by those already a party to that lawsuit. *Smuck v. Hobson, supra.* If the intervenor's claims prove to be without foundation, then, of course, judgment may be entered against it. But that determination should be based on the merits of the claims, as tested at trial.

The nature of those interests which should have caused the Bank to be allowed to intervene in the trial court dictate the nature of the relief to which it is entitled. So far as those issues which have already been litigated between Marcor and O'Hara Denver are concerned, it does not appear that, had the Bank been allowed to intervene, it would have been able to more adequately protect its interests in those matters than was O'Hara Denver. Thus, we remand for a new trial limited solely to those issues which the Bank asserts it was unable to present to the trial court. Those issues which were litigated between Marcor and O'Hara Denver are not to be relitigated. If a new trial is held, and if appellate review of that trial is sought by either of the parties, that review will be limited solely to those same issues which are to be the subject of the new trial. *Smuck v. Hobson, supra.*

■■■ Accordingly, we affirm in part, reverse in part, and return this case to the court of appeals with directions to remand to the district court for a new trial limited to those issues which the Bank was unable to present below, and in which it was not adequately represented by O'Hara Denver, and for further proceedings not inconsistent with the directions set forth in this opinion.

MR. JUSTICE GROVES affirms in part and dissents in part.

MR. JUSTICE LEE and MR. JUSTICE ROVIRA do not participate.

MR. JUSTICE GROVES dissenting in part:

I would affirm the district court and the court of appeals entirely. I regard the First National Bank of Englewood as being foreclosed from further attempts to intervene after it failed to try to prosecute an appeal from the denial of the first motion to intervene.