**BOARD OF COUNTY COMMISSIONERS OF ADAMS COUNTY, City of Aurora, City of Brighton, City of Commerce City, and City of Thornton, Plaintiffs–Appellees and Cross–Appellants,**

v.

**CITY AND COUNTY OF DENVER, Defendant–Appellant and Cross–Appellee.**

No. 00CA0217.

Colorado Court of Appeals, Div. II.

March 29, 2001.

Rehearing Denied May 3, 2001.

Wood, Ris & Hames, P.C., Mark R. Davis, Denver, CO, for Plaintiffs–Appellees and Cross–Appellants.

J. Wallace Wortham, Jr., City Attorney, Helen Eckardt Raabe, Deputy City Attorney, G. Nicholas Pijoan, Assistant City Attorney, Holme Roberts & Owen, LLP, Patricia C. Tisdale, Martin D. Litt, John R. Webb, Roxanne J. Perruso, Denver, CO, for Defendant–Appellant and Cross–Appellee.

Opinion by Chief Judge HUME.

In this breach of contract action, defendant, the City and County of Denver (Denver), appeals the trial court's award of contractual damages to plaintiffs, Board of County Commissioners of Adams County (Adams), City of Aurora, City of Brighton, City of Commerce City, and City of Thornton, based on excessive noise levels at the Denver International Airport (DIA). We affirm.

This dispute arises out of an Intergovernmental Agreement (IGA) entered into on April 21, 1988, between Denver and Adams (the parties). The named cities are third-party beneficiaries of the IGA. When the parties began negotiations, Denver needed a new airport, but did not have enough land to build one. Plaintiffs originally sought to build a multijurisdictional airport, in which they would share authority with Denver. Denver, however, insisted on retaining sole ownership and control of the new airport and focused on annexing land from Adams. In response, Adams sought to negotiate an agreement that would address its primary concern regarding the noise impact a new airport would have on Adams and its cities.

Under the IGA, Denver promised to operate DIA within maximum noise levels called noise exposure performance standards (NEPS). Denver agreed that if these noise levels were exceeded and not cured as provided by the IGA, then Denver would compensate plaintiffs with noise mitigation payments.

Two types of NEPS are defined in the contract: the Leq(24) grid points and the 65 Ldn noise contour line. The Leq(24) is comprised of 101 grid points on the north, west, and south sides of DIA. If a grid point's actual noise level is greater than its particular standard, a Leq(24) violation occurs. The 65 Ldn noise contour line loosely traces DIA's runway configuration with protrusions on each side of the compass. A 65 Ldn violation occurs where the actual 65 Ldn noise level occurs on land beyond the contour line boundary.

DIA opened in 1995, and noise problems followed soon after. Denver violated the Leq(24) grid points fifty-six times and exceeded the 65 Ldn contour in six places during the first year. Seven of the Leq(24) violations were not cured in the second year, and plaintiffs brought suit in accordance with the IGA.

Both plaintiffs and defendant moved for summary judgment. Plaintiffs argued that the noise mitigation payment provision in the IGA was an alternative performance or guarantee of performance provision. In the alternative, plaintiffs argued that the payments were valid and enforceable liquidated damages. Denver argued that the provision was a liquidated damages clause, but unenforceable as a penalty. The court determined that the provision constituted a clause for liquidated damages, but also found that genuine issues of material fact existed as to whether it was enforceable.

Following a four-day trial to the court, the trial court awarded plaintiffs $4.0 million, finding that the provision was enforceable as a valid liquidated damages clause. The damage award consisted of $500,000 for each of the seven grid point violations and $500,000 for violating the noise contour. The court also granted $1,307,218 in prejudgment interest to plaintiffs.

This appeal and cross-appeal followed.

## I.

Denver first contends that the trial court erred in finding that the noise mitigation payment provision constituted a valid and enforceable liquidated damages clause. We perceive no error.

Paragraph 5.6.3 of the IGA states:

If the court, after hearing the matter, does not order Denver to exercise its authority to impose such rules and regulations as will achieve and maintain the NEPS, or determines that Denver does not have such authority, then the New Airport shall make a noise mitigation payment of $500,000 for each violation to Adams County or to the city, if any, within which the property affected by the NEPS violation lies.

■ Unless the contract reveals on its face that the stipulated payment is so disproportionate to any possible loss as to constitute a penalty, the determination of whether the specified damages constitute a penalty is a question of fact. *Yerton v. Bowden,* 762 P.2d 786 (Colo.App.1988).

■ To make a factual determination that a liquidated damages clause is valid and enforceable, the court must find that: (1) at the time the contract was entered into, the anticipated damages in case of breach were difficult to ascertain; (2) the parties mutually intended to liquidate them in advance; and (3) the amount of liquidated damages, when viewed as of the time the contract was made, was a reasonable estimate of the potential actual damages the breach would cause. *Perino v. Jarvis,* 135 Colo. 393, 312 P.2d 108 (1957).

■ Denver bore the burden of proving that the noise mitigation payment provision is an unenforceable penalty. *See Rohauer v. Little,* 736 P.2d 403 (Colo.1987).

The trial court determined, and we agree, that the noise mitigation payment provision is not so disproportionate on its face as to constitute a penalty. Further, the trial court properly considered the three listed elements in determining that the provision was valid and enforceable.

## A.

■ As to the first element, the trial court found that the evidence established that "it would have been difficult, if not impossible, at the time the IGA was executed, for the parties to ascertain the amount of actual damages that could occur." The fifty- to one-hundred-year expected duration of DIA and the IGA made it particularly difficult to project future population, land uses, and damages. Denver's own expert appraiser testified to the near impossibility of predicting any decrease in property values based on DIA noise as distinct from other factors. Denver does not appear to contest the trial court's factual determination of this issue, and we perceive no error.

## B.

■ As to the second element, the trial court also found that the parties intended to liquidate damages in advance, but Denver now argues that the plain language of the IGA, along with plaintiffs' conduct and admissions demonstrate that the parties intended the noise mitigation payments as penalties. Again, we perceive no error.

■ In determining the parties' mutual intent, the court should consider the contract's subject matter and the purposes and objects it purports to accomplish. In making this evaluation, the circumstances surrounding the creation of the contract may also be considered. *Powder Horn Constructors, Inc. v. City of Florence,* 754 P.2d 356 (Colo.1988).

Here, the evidence at trial established that the IGA was an intensely negotiated document that took over three years to complete. Both parties were represented by sophisti-

cated business people, including experts and attorneys experienced in negotiating contracts.

The IGA is replete with language identifying the parties' shared understanding of the critical importance of noise exposure levels and compliance with the NEPS provisions. Specifically, the second recital states that the intent of the IGA was to provide a new airport that would "avoid unacceptable noise levels in surrounding communities." In addition, paragraph 5.1, titled "Importance of Noise Control," provides that:

> Denver recognizes that noise generated by aircraft flight operations constitutes a primary concern of . . . [plaintiffs] and that [plaintiffs] will rely on the provisions of this Agreement to make important land use decisions concerning the appropriate location of residential, commercial and industrial developments.

Paragraph 5.1 further states that "Denver recognizes that it is vitally important that the design, construction and operation of [DIA] result in actual Noise Exposure Levels which conform" to the maximum noise levels set forth in the IGA.

Adams' chief negotiator testified that the parties thoroughly negotiated both the title and the amount of the noise mitigation payment provision. Throughout the negotiations the parties discussed what name to assign the damages clause. He testified that the parties were aware of the legal significance of choosing the term "noise mitigation payment" as opposed to the term "fine" or "penalty." He also testified that plaintiffs believed the noise mitigation payments would mitigate damages in the event that Denver failed to bring DIA into compliance with the NEPS, and that the parties initially could not agree on the amount of noise mitigation payments because of their inability to predict when and where actual damages might eventually occur. Consequently, the final figure of $500,000 per violation was the subject of exhaustive negotiation.

The term "mitigation payment" also appears in paragraph 4.4 in connection with compensation for lost tax revenue. The court found that the parties' conscious use of the term in both contexts evidenced their intent to liquidate damages in the noise mitigation payment provision. In addition, paragraph 5.8 requires plaintiffs to join defendant in defending any legal action where noise levels do not violate NEPS regardless of the level of damages, further demonstrating the parties' intent to liquidate damages under the IGA.

Denver argues that the failure to use the term "liquidated damages," the use of the word "violation," and the existence of an "enforcement process" required the court to find that the parties intended the noise mitigation payments as an unenforceable penalty. We disagree.

■ The terms used by the parties are not conclusive as to whether a contract provision was intended to be a liquidated damages clause. *Sorenson v. Connelly,* 36 Colo.App. 168, 536 P.2d 328 (1975). Rather, the determination depends upon the intention of the parties as it appears from the nature of the contract, the situation of the parties, and the attending circumstances. *Gougar v. Buffalo Specialty Co.,* 26 Colo.App. 8, 141 P. 511 (Colo.App.1914).

Denver agreed to both the definitions of NEPS violations and the enforcement structure, and we conclude that the plain language of the IGA does not support its position that the terms used are indicative of a fine or penalty.

■ Denver also asserts that the trial court erred in not finding that the parties' conduct and statements were binding admissions that they intended the noise mitigation payment provision to be a penalty. In support of this assertion, Denver produced evidence at trial that various officials of both parties had characterized the noise mitigation payments as penalties or fines before DIA opened. We are not persuaded.

While it has been held that a contemporaneous construction by a party prior to the controversy, which is contrary to the position taken by the party in the subsequent lawsuit, is binding upon the party, the intent of the parties is still to be given greater regard than the possibly inept choice of words. *See Erdenberger, Inc. v. Partek North America,*

*Inc.*, 865 P.2d 850 (Colo.App.1993). Remarks to the media and other correspondence outside the scope of the original negotiations do not displace evidence of the parties' intent to liquidate damages at the time they entered into the IGA.

 Denver also argues that Adams' use of the word "penalties," in a previous complaint filed against Denver in other litigation concerning the development of the noise monitoring system, constituted a judicial admission. While a judicial admission may be conclusive on the party making it, *Kempter v. Hurd*, 713 P.2d 1274 (Colo.1986), pleadings in other lawsuits are not necessarily judicial admissions. As here, statements may be only ordinary admissions, which are not conclusive. *See Bryant v. City of Lafayette*, 946 P.2d 499 (Colo.App.1997); 4 J. Wigmore, *Evidence* § 1066 (Chadbourn rev.1972).

 Similarly, we reject Denver's contention that plaintiffs' motion for summary judgment, which characterized the noise mitigation payment provision as an alternative performance or guarantee of performance provision, should also be binding upon them. Plaintiffs also argued in the alternative that the provision was an enforceable liquidated damages clause. Thus, they did not take a new and contrary position at trial. Moreover, Denver argued in its own motion for summary judgment that the noise mitigation payments must be liquidated damages because plaintiffs had so labeled them in their complaint and C.R.C.P. 26(a)(1) disclosures.

After considering all evidence presented at trial, the trial court was satisfied that the parties intended to liquidate damages in advance. *See Gougar v. Buffalo Specialty Co., supra.* We perceive no error in that determination.

## C.

 As to the third element, the trial court also found that the liquidated damages, when viewed as of the time the parties entered into the IGA, were a reasonable estimate of the presumed actual damages that a breach of the NEPS would cause. Contrary to Denver's arguments, again we perceive no error.

As noted, the IGA states that the NEPS were established to "avoid unacceptable noise levels in surrounding communities." At trial, testimony of both plaintiffs and Denver established that the Leq(24) grid points were meant to protect not only the areas in the immediate vicinity, but also to act as a fence or barrier to protect residential areas well beyond the grid points. Evidence introduced at trial also demonstrated that the parties intended to protect the areas beyond the NEPS 65 Ldn contour as well.

In addition, both Denver's and Adams' chief negotiators testified that throughout the negotiation of the IGA, the parties presumed that plaintiffs would sustain damages if the NEPS provisions were violated. Thus, the parties agreed that, by definition, if the NEPS were violated, plaintiffs would be exposed to and damaged by higher levels of aircraft noise than they agreed to in the IGA.

Plaintiffs used population statistics to demonstrate further the extreme difficulty in projecting future damages caused by a NEPS violation when the location, extent, and duration of, and the number of individuals and entities affected by, a NEPS violation could not be known. Adams' chief negotiator also testified that the parties negotiated the amount of the noise mitigation payments with a full understanding of the uncertainties involved in predicting actual damages and that only after extensive negotiations did the parties agree upon $500,000 as the appropriate amount.

The court found that Denver had not provided any evidence that the $500,000 figure was inappropriate, nor did Denver offer evidence of any other reasonable estimate of the presumed actual future damages for NEPS violations. In any event, the relevant inquiry is not whether the determined amount is a reasonable estimate of the damages actually incurred during DIA's first year of operations, but whether at the time the parties executed the IGA, the amount was a reasonable estimate of the damages that would occur in the future.

Denver also argues that the noise mitigation provision is a penalty because the IGA established a fixed amount of $500,000 for

any and all "Class II" noise violations. We are not persuaded.

■ If a contract stipulates a single liquidated damage amount for several possible breaches, the damage provision is invalid as a penalty if it is unreasonably disproportionate to the expected loss on the very breach that did occur and was sued upon. *Yerton v. Bowden, supra.*

Such, however, is not the case here. The IGA specified two levels of NEPS violations: Class I, where the sound level exceeds the NEPS by less than two decibels; and Class II, where the violation is more than two decibels. The $500,000 noise mitigation payments apply only to Class II violations. Therefore, as the court found, "the provision is not a one fee, single damage amount applied to any breach of any covenant in the IGA." Nor was there evidence that the liquidated damage provision is disproportionate to the anticipated loss occasioned by the breach.

Denver relies on *Lake River Corp. v. Carborundum Co.,* 769 F.2d 1284 (7th Cir.1985), which states the following:

The formula ... is invariant to the gravity of the breach. When a contract specifies a single sum in damages for any and all breaches even though it is apparent that all are not of the same gravity, the specification is not a reasonable effort to estimate damages; and when in addition the fixed sum greatly exceeds the actual damages likely to be inflicted by a minor breach, its character as a penalty becomes unmistakable.

In that case, however, the penalty was visible from the face of the contract, and the actual damages could be easily computed. Here, the parties agreed upon specific NEPS levels, and any noise that exceeded the maximum allowable level was, by definition, made unacceptable. Thus, no breach resulting in a Class II violation was considered to be minor by the contracting parties, and *Lake River* does not persuade us otherwise.

Since the evidence at trial amply demonstrated the great difficulty of establishing the amount of loss at the time the parties entered into the IGA, the trial court correctly allowed plaintiffs considerable latitude in showing that the noise mitigation payment amount was a reasonable estimate of damages. *See* Restatement (Second) of Contracts § 356 comment b (1981).

The trial court's determination that the evidence satisfied the three elements required for a valid liquidated damages clause is supported by the record. Thus, we will not disturb these findings on appeal. *See O'Hara Group Denver, Ltd. v. Marcor Housing Systems, Inc.,* 197 Colo. 530, 595 P.2d 679 (1979).

## II.

Denver next contends that plaintiffs failed to prove any actual damages and should not be permitted to reap a windfall from liquidated damages. We reject this contention.

■ We initially note that the supreme court has not indicated that proof of actual damages is indispensable to the enforceability of a liquidated damages provision. Instead, the court has emphasized that the test set forth in *Perino v. Jarvis, supra,* ascertains whether a liquidated damages clause is valid and enforceable. *Rohauer v. Little, supra.*

In any event, the trial court here found that plaintiffs had suffered actual injury. The testimony at trial demonstrated that the grid points and 65 Ldn contour line were intended to act as a barrier to protect areas beyond them from excessive noise. Denver's own expert witness testified that the peak noise levels of overhead aircraft would far exceed the ambient noise levels, thus causing damage to plaintiffs. The witness also testified that actual peak noise energy levels increase dramatically in relation to very small averaged decibel increases.

The trial court found that, according to the evidence presented at trial, the actual noise levels from NEPS violations constituted a quadrupling of the projected noise energy levels. The record supports these findings, and we will not disturb them on appeal. *See Wojtowicz v. Greeley Anesthesia Services, P.C.,* 961 P.2d 520 (Colo.App.1997).

■ Denver also argues that plaintiffs lack standing to claim compensation for damages because the damages alleged were suffered by their individual citizens, and not by plaintiffs. Specifically, Denver argues that under the *parens patriae* doctrine, a state may maintain a suit on behalf of its citizens, but counties and cities are political subdivisions of the state and lack the critical element of sovereignty. While we agree with the principle Denver espouses, we deem it inapposite here.

The parties entered into the IGA pursuant to §§ 29–1–201, et seq., and 30–6–109.5, C.R.S.2000. Section 30–6–109.5 permits annexation agreements between counties for the building of airports. Section 29–1–201 permits and encourages "governments to make the most efficient and effective use of their powers and responsibilities by cooperating and contracting with other governments."

The first recital in the IGA states that Adams entered the IGA "in reliance upon Denver's representations as to the noise impacts of the New Airport," which "will serve as a catalyst for economic development in Adams County." Further, paragraph 5.1, entitled "Importance of Noise Control," states that plaintiffs will rely on the IGA "to make important land use decisions."

In light of these statutory and contractual provisions, we conclude that plaintiffs have standing to sue on their own behalf in this action.

### III.

■ Denver next contends that the trial court erred in refusing to find that Adams violated a condition precedent to its recovery under the IGA. Specifically, Denver points out that Adams enacted zoning regulations that permit construction of new single-family residences within the contour area subject to restriction under the IGA. We find no error.

The IGA provides in paragraph 8.3 that, as a prerequisite to any action for violation of a NEPS Ldn noise contour, Adams must have adopted and maintained "land use regulations which prohibit Incompatible Residential Development within the 65 Ldn contour." Paragraph 2.37 defines the noise contour to include areas where the appropriate jurisdiction has enacted zoning regulations that prohibit "all residential uses, not existing as of right at the time of enactment of such ordinance or regulation."

When the IGA was executed, Adams adopted zoning regulations that prohibit new residential zoning within the 65 Ldn contour, but permit construction of new single-family dwellings on lots that existed and were zoned for residential construction as of the effective date of the regulations. The regulations further provide that, while existing residential uses may continue, they may be limited by the restrictions itemized in the Adams County Zoning Regulations pertaining to non-conforming uses.

Denver argues that the "use" must have actually existed at the time the regulations were enacted, and not merely the "right" to construct a residence. To the contrary, as the trial court found, the IGA excepted from its prohibition of incompatible residential development those residential uses that existed as of right at the time the IGA was adopted. Thus, the IGA does not require Adams to rezone property within the 65 Ldn contour, compromising the residential uses existing as of right at the time the regulations were enacted.

Nor does the case law cited by Denver require a different result. While uses permitted by particular zoning classifications are not vested rights, and subsequent zoning regulations are binding upon owners, nothing in the IGA requires Adams to enact more stringent regulations. *See Town of Lyons v. Bashor,* 867 P.2d 159 (Colo.App.1993).

Based upon the plain language of the IGA and testimony at trial, the court thus properly found that Adams' zoning regulations fully complied with the IGA.

### IV.

■ Denver next contends that the trial court erred in awarding damages because plaintiffs failed to prove that specific performance was unavailable. In addition, Denver argues that the trial court impermissibly shifted the burden of proof concerning specific performance to Denver. We do not agree.

Under paragraph 5.6.1 of the IGA, when a Class II noise violation occurs, the parties must jointly petition the FAA to implement flight procedures to achieve and maintain the NEPS. If the FAA fails to do so, then Denver as Airport Proprietor must "impose such rules and regulations as achieve and maintain the NEPS." If Denver fails to take action, then plaintiffs may seek a court order compelling Denver to do so. The damages provision is triggered if the court does not order Denver to exercise its authority or determines that Denver does not have the authority.

The record shows that the parties jointly petitioned the FAA, which declined to act. According to the IGA, next Denver should have enacted rules and regulations to achieve the NEPS, which it did not do. Plaintiffs then petitioned the court for specific performance and injunctive relief, together with damages.

In its summary judgment order, the trial court held that plaintiffs were not required to prove either the causes of the NEPS violations or the rules and regulations that would achieve and maintain the NEPS. At trial, plaintiffs did not present any evidence of potential means by which Denver could abide by the NEPS, other than suggesting in closing arguments that Denver reduce operations at DIA by ten percent. The court did not require more of plaintiffs:

> Plaintiffs were not in possession of, and could not readily obtain, the information necessary to propose what rules and regulations Denver could impose to comply with the NEPS. Further, since it is Denver's obligation pursuant to paragraph 5.6.2 to impose rules and regulations to achieve the NEPS, Denver has an implicit burden to identify such rules and regulations. At trial, Denver did not present any evidence of potential rules and regulations Denver could impose to achieve NEPS compliance. Thus, Denver's argument that Plaintiffs must first prove that Denver could not impose rules and regulations to comply with the NEPS fails for all of the reasons stated above.

The trial court denied plaintiffs' request for specific performance because it did not

"have the expertise to enter an order for specific performance...." Moreover, without evidence from Denver or plaintiffs, any order of specific performance would impose on the court a burden of supervision and enforcement disproportionate to any advantage gained. *See* Restatement (Second) of Contracts § 356 (1981). We thus perceive no error in the court's determination.

### V.

■ We also reject Denver's contention that plaintiffs failed to prove that six of the seven grid point violations actually exceeded the maximum noise levels for Class II violations.

To enforce the NEPS, the IGA requires that "Denver shall install and operate a noise monitoring system capable of recording noise levels sufficient to calculate Ldn noise contours and Leq(24) values for the purpose of monitoring and enforcing the NEPS." The IGA defines a Class II NEPS grid point violation as "an actual Leq(24) value for any grid point ... which exceeds the NEPS Leq(24) for that grid point by more than 2dB." DIA's Aircraft Noise Abatement Office publishes Quarterly and Annual Reports; the Annual Report compiles the data from the noise monitoring system and identifies NEPS violations for the year.

Denver specifically argues that the noise monitoring system it installed is not sophisticated enough to measure accurately the actual noise level within 2 decibels, and, therefore, Denver should not be held liable for six NEPS violations where the monitoring system only calculated aircraft noise levels within plus or minus 3 decibels. We are not persuaded.

Under the plain language of the IGA, the parties agreed it would be Denver's responsibility to develop a system sufficient to comply with the noise monitoring requirements. The court found that at the time the parties entered into the IGA, they were aware that the technology did not exist to create a noise monitoring system capable of generating accurate measurements of the actual noise generated by DIA aircraft at the grid points. However, several of Denver's witnesses testi-

fied that Denver's noise monitoring system is capable of satisfying the IGA, and one witness admitted on cross-examination that the calculated measurement undervalued the sound level by an average of 2.9 decibels.

The court also found that it was reasonably foreseeable at the time the parties entered into the IGA that the noise monitoring system might not be completely accurate and that Denver agreed to enter the IGA with this understanding. In addition, the court found that Denver had not demonstrated any change of circumstance rendering its promise to comply with the NEPS different from what the parties' reasonably should have contemplated when they entered into the IGA. *See City of Littleton v. Employers Fire Insurance Co.*, 169 Colo. 104, 453 P.2d 810 (1969). Thus, we perceive no error in the trial court's determination.

■ Denver also argues that NEPS compliance is impossible because DIA opened with only five runways, rather than the six contemplated by the IGA. We disagree.

Adams' lead negotiator testified that during negotiations, the parties agreed that, even if DIA opened with only four or five runways, the NEPS would apply to DIA's operations. In addition, Denver's technical advisor testified that he performed a study determining that DIA could operate in compliance with the NEPS using five runways.

Denver did not present any evidence that the lack of a sixth runway caused the NEPS violations, nor did it produce evidence that the addition of a sixth runway would allow Denver to comply with the NEPS. Plaintiffs presented a study, prepared for Denver, showing that a sixth runway would actually increase noise levels. Denver argues that the study is unreliable and the court erred in admitting it under the residual hearsay exception. However, the trial court found that the report was probative of the validity of Denver's defenses and that it was not inherently unreliable.

Based on this evidence, we perceive no error in the court's finding that NEPS compliance was not impossible.

## VI.

■ Denver finally contends that the trial court erred in awarding plaintiffs prejudgment interest from the date it found Denver had breached the IGA. We disagree.

Section 5–12–102, C.R.S.2000, allows non-breaching parties to recover prejudgment interest. Colorado courts have liberally construed a party's right to recover under the statute. In *Mesa Sand & Gravel Co. v. Landfill, Inc.*, 776 P.2d 362 (Colo.1989), the court held that in breach of contract cases, the General Assembly intended for prejudgment interest to accrue from the time of breach, not from the entry of judgment.

■ The trial court found that Denver was in breach of the IGA as of February 28, 1996, which was the last day of the first year of DIA's operations. Denver argues that the IGA's cure process changes the breach date, but, to the contrary, an action for breach of contract accrues when the breach and damages occur, not when the court selects the remedy for the breach. Further, the prejudgment interest applies only to uncured violations. In these circumstances, we conclude that the trial court correctly awarded plaintiffs prejudgment interest.

## VII.

■ Plaintiffs cross-appeal from the trial court's determination that the IGA permits only one Ldn noise contour violation per year. We perceive no error.

■ Whether a contract is ambiguous is a question of law for the court to decide. *Pepcol Manufacturing Co. v. Denver Union Corp.*, 687 P.2d 1310 (Colo.1984). A contract must be interpreted in a manner that effectuates the manifest intention of the parties at the time the contract was signed. Words and phrases should be interpreted by examining the contract as a whole. *Roemmich v. Lutheran Hospitals & Homes Society*, 934 P.2d 873 (Colo.App.1996). Courts will consider extrinsic evidence of the parties' intent when the contract's terms are ambiguous. *Cheyenne Mountain School District # 12 v. Thompson*, 861 P.2d 711 (Colo.1993).

 Paragraph 5.5 of the IGA defines both grid point and contour NEPS violations and provides that "each deviation [shall be] a separate violation." However, paragraph 5.3.1 defines only one contour violation and both paragraphs 5.5.1 and 5.5.2 refer to a "violation" when defining Class I and Class II Ldn contour NEPS. Thus, this language identifies only one violation as opposed to multiple violations.

Consequently, we agree with the trial court that, considered together, the terms of the IGA are susceptible of more than one interpretation regarding the possible number of 65 Ldn contour violations per year. In view of this ambiguity, the court correctly considered extrinsic evidence of the parties' intent.

The IGA does not specifically address the issue of multiple contour violations, and plaintiffs did not call any witnesses who recalled any discussions regarding whether multiple 65 Ldn contour deviations in one year would constitute multiple NEPS violations. One of Denver's witnesses testified that the parties specifically discussed the issue and agreed that, regardless of the number of Ldn contour deviations, there could be only one Ldn contour violation per year. That witness, however, could not recall the date, location, or participants at the meeting, and the trial court determined that his testimony alone was not persuasive.

The court found that the parties had recognized both the importance of the issue and the unusual nature of the Ldn contour. Hence, their failure specifically to delineate whether multiple deviations constituted multiple violations was compelling evidence that they either had no meeting of the minds on the issue or did not contemplate multiple 65 Ldn NEPS violations. Accordingly, we conclude that the trial court did not err in compensating plaintiffs for only one contour violation per year under the terms of the IGA.

The judgment is affirmed.

* Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, Sec. 5(3),

ROTHENBERG and CRISWELL *, JJ., concur.

and § 24–51–1105, C.R.S.2000.